Good morning. May it please the Court, my name is Paul Murphy. I represent the plaintiff-appellant in this case, SelectMetrics. I would like to hand up to the bench an excerpt from the contract that is at issue in this case. It includes Section 3 of the contract, which is the fee section, and Section Exhibit A. I think we have it. If you want to give it to us. They're in there. I've got the two pages sequential, is the order. Sure. Usually you should ask in advance before doing something like that. This case went before the trial court on cross motions for summary judgment. The trial court denied SelectMetrics' motion for summary judgment. It granted the motion of summary judgment of NetRatings. The court found that NetRatings had breached the agreement, but nonetheless concluded that SelectMetrics was not entitled to any damages. And that conclusion, although not very clearly stated in the trial court's order, appears to have been based on first his interpretation of the limitation of liabilities clause, which limited SelectMetrics' damages to the amount of royalties to which it was entitled at the time of the breach, and secondly his interpretation of the royalty clauses themselves. We believe that the interpretation that the trial court gave to the royalty clause was impermissible because the interpretation requires that certain very clear and unambiguous portions of the contract. It was in direct conflict with those portions. And I'd like to direct the panel's attention to Exhibit A, the second page of the exhibit I just handed up there, and subparts 1 and 2. There are statements in that section of the contract that are absolutely unambiguous. One of them is that for international, non-U.S. customers, SelectMetrics will receive a per-customer minimum royalty of $9,000 per 12 months of service. The base price includes 500 million page views per year. And then under Mr. Murphy Yes, Your Honor. What you're not reading is the introductory paragraph which says, the minimum royalty payments the net rating shall make. That's mandatory. With respect to, quote, I'm quoting, net revenues, unquote. Net revenues is defined at 3.42 as gross revenues, less amounts collected for sales, tax, et cetera, et cetera, et cetera, and refunds. Now, what it means, as I read it, is no pay, no play. Well, Your Honor, I disagree with that. And I believe that that is because if you look at the language in subsections 1 and 2, in the exhibits, those are qualified statements. They state that SelectMetrics will receive some money. And it tells how that money is calculated. But will receive if they get paid. There is no statement in the introductory part. That is not an if. There's no ifs. There's no that receive money if and only if. The question that the trial court tried to answer is what is the clause with respect to net revenues generated both inside and outside the United States. Somehow, whatever he decided that meant, it necessarily conflicted directly with the very, very clear language under the two subparts that say that SelectMetrics will receive an amount of money. There is no question that there was one U.S. customer, there were four China customers, and that there were billions of page views. Net revenues is defined as shall mean gross revenues, less amounts collected. Gross revenues is defined as amounts that are received by net ratings. I mean, you're trying to say that if I understand you correctly, and correct me if I'm wrong, you're trying to say as to the minimum royalties, net ratings is chargeable for $15,000 and the $9,000, whether or not they're paid by their customers who say the service is terrible, we can't use it, and we're not going to pay you, right? Yes, Your Honor, that's exactly what I'm saying because the language Does that seem to you to be a good business? Your Honor, the circumstances of the case were that SelectMetrics was a failing business, did not have the cash to continue, and yet net ratings was having success signing up China customers. And at the time, it was imperative, in order to perform under those contracts, they needed to have SelectMetrics perform its, host the software. And net, or excuse me, SelectMetrics could not do so unless it was going to get paid at least the cost. The cost was the cost of setting up the customers. The whole structure of the royalty, I mean, you could have a royalty system that depended on the number of hits on the Internet, but that isn't the way this whole thing was set up. It was set up with regard to 60 percent of the first X amount of net revenue, and then 50 percent of additional net revenue, and so on. So the basic fees were based on net revenue. Then you come to the minimum fees, and it says with respect to net revenues. Why would it say respect to net revenues if it wasn't dependent on there being net revenue? Because, Your Honor, what this language is attempting to do, with respect to means the same as concerning, what it was attempting to do, the key language there is generated both inside and outside the United States. It's to make very clear, it's to make very clear that you look at two numbers. One is an aggregate number, all the net revenues. The other one is the customer. But where the royalty is dependent on money and not on usage, which it is under this entire agreement. Isn't the – and the words are tending in that way anyway. Isn't the way to read this is to say no money, you know, as Judge Mayer says, no money, no royalty? No, Your Honor. That directly conflicts with the language on Exhibit A. And plus the introduction. The introduction to Section 3 has that net ratings will pay royalties in consideration of the licenses granted as calculated in the following manner, but in no case less than the minimum royalty described below. Yes, there was two ways of calculating it. One was totally dependent on net revenues. The other one was totally dependent on a contract-by-contract look in terms of customer numbers and page – page views. But the minimum royalty described below is, again, with respect to revenues generated. Generated both in and out. And what they're trying to say there, Your Honor, is you don't look at one contract and look at the net revenue associated with that contract and give that as a minimum. You look at an aggregate minimum. The point is it's generated both within and without. It's an attempt to say you don't pick the higher of Column A and Column B for each contract. You sum up Column A and you sum up Column B and you give the higher of those two numbers. What you're arguing, counsel, is that the distributor here, net ratings, is going to front a payment of $15,000 per U.S. customer and front $9,000 per international customer whether they get a dime from those customers or not. True? Not front it. They take the collection risk. Yes, Your Honor, that's exactly what I'm saying. They're going to pay it. They're going to pay it. That's what I mean by fronting it, right? After the fact. Whether or not they get a dime from their customer. Yes. The guaranteed minimum was, in fact, a risk allocation device, and net ratings took the risk that the net revenues that it got under this contract would not be adequate to fully fund the guaranteed minimum. That's what a guaranteed minimum is. Yes, but zero and something are different. The number was not zero. That was simply a mistake by the trial court. The number was there were revenues under this contract. Those revenues exceeded the amount that was paid out to my client. Zero was never part of it. Just the four China customers, the four customers where the breaches were the most egregious, they didn't happen to pay, not surprisingly. By that time, net ratings had essentially told them we're going to replace the product with something else. But it was never zero. So are you contesting, as a material issue of fact on the record, the notion that in fact there was no revenue, no net revenue? There was no dispute about that. The evidence showed that the CEO of net ratings --. Well, if there's some net revenue, then you're entitled to the money. So why are we here?  damages are associated with the breach of the contracts with the China customers. And he simply looked at that and basically acted as though the net revenues or the revenues from other sources were irrelevant to determining the damages we could reserve. Now, there's no question that the revenues that were received are significantly less than what we're entitled to under the guaranteed minimum. But there's no question that there was revenues received. And so, therefore, you're not claiming that the court was wrong in not awarding you damages as to those revenues that were received. You got those, right? No. We did not receive them. We did not receive an amount that was comparable with what we should get under this contract. So you're saying that there were some U.S. customers as to which you should have gotten $15,000 apiece because there was revenue collected from those U.S. customers. That's correct. But we're also saying, we are clearly saying, Your Honor. Is that raising your brief? Yes. I didn't see it. Can you give me a citation of that? In our opening brief at page 10 and 11, we cite the fact that there was payment made by VNU, which was a U.S. customer. It's an affiliate of Net Ratings. There's evidence in our motion for summary judgment as to the amount of the payment that was made to VNU. It was about $12,900. But our key point. The only argument, the only issue you raised is that this was true of the contract. Yes. We contend that the guaranteed minimum royalty is, in fact, a guaranteed minimum royalty. It is to be calculated entirely based upon the number of customers and the paid hits and that we will receive it. And that any interpretation of the contract that says we won't receive $9,000 per customer is impermissible because it directly conflicts with a very, very clear clause in the contract, and there's nothing in that introductory phrase that really says we will receive it if there are net revenues adequate to cover it. That's not what it says. Counsel, may I ask you one question? Other than VNU, the U.S. customer, $12,900, that's under $15,000. So that would be under the minimum royalty amount, right? The amount we got was around $12,000, and that was based on the 60% calculation. So under any set of circumstances, we did not get paid an amount that was provided for in the contract. We also have some questions as to whether there was money received from another customer named Ad Banners. We showed that there was use by that customer. It was a contract customer. But these 12% – You received $12,900 from DNU, right? No, we received it from – I mean, that's from the contract, right. Which represented – But that seems to have gotten completely lost in the shuffle. It's not in your brain. That is not our main issue. Our main issue is that you have to interpret the minimum provision to allow that we will receive money that the contract says – Even if it's zero. You said it's not zero. But your real issue is even if it's zero. Even if it's zero, when the contract says we will receive X amount per customer, we should receive that. And any interpretation that does not provide for that is impermissible under Oregon law. At summary judgment, you can see that there was no revenue generated by the China contracts, correct? To the best of our knowledge, there was no – There's no money from China. Net ratings had said there were none – there was none, and we don't have any evidence to contradict that. Okay. Thank you, Counsel. What's your standard of review here? Are we reviewing for – as a fact, as a law? What are we doing? It's de novo, Your Honor. It's a summary judgment motion. You have as – It's a summary judgment motion, but over a contract question. All right. Go ahead. I believe you stand in as good a position as the trial judge in interpreting it. Why would we do that? It's a question – a question. Contract interpretation under Oregon law is a matter of law. Correct. Oh, so we're de novo, right? Yes. That was what I said, Your Honor. All right. I may not be speaking up clearly enough. All right. Go ahead. May it please the Court, my name is Noah Weissman. I am counsel to Net Ratings. As you heard from Select Metrics Counsel, the issues before the Court is a limited one. It's whether the district court properly interpreted the minimum royalties clause to find that there were no – So this other problem of whether they should have gotten paid 15,000 instead of 12,900 is really not the case. I don't believe so, Your Honor. Your Honor, the evidence that was in the record shows that Select Metrics was paid $20,000. It was $13,000 and $7,000. There was never a claim or any evidence put in that the money paid with respect to VNU was insufficient or inadequate. The dispute really centered on whether the payments – or there should have been payments for the four China clients for which no revenue was received and no share given over because there was no money. As the Court heard – Well, pardon me, Mr. Weissman. I thought I heard Mr. Murphy say that as to U.S. customers, there's a guaranteed minimum royalty of $15,000 for 12 months of service. So $13,000 from one is $2,000 short. $7,000 to another is $8,000 short. I misspoke, Your Honor. It was two payments. The payments totaled $20,000. For one customer? There was only one customer that ever paid. Oh, so he got his minimum on that. Yes. All right. Oh, okay. Now I've got you. All right. Under the agreement, net ratings was the distributor of plaintiff's licenses for their products. And the way the agreement was worded, and as the Court has pointed out, was the parties were going to split the royalties received. Four months after the contract was executed, it was terminated, each side accusing the other of breaches. And under the limitation of liability clause, which has not been appealed, any damages are limited to the amounts due and owing 12 months prior to the alleged breach, considering only four months were in effect for the contract. The issue is whether there were four months of payments due for the China clients. The key undisputed fact, as the Court has heard, was that the China clients refused to pay. There were no royalties received. That's key because Section 3.3 and Schedule A basically did deal with a minimum royalty, but it's not the minimum royalty that plaintiff is arguing. It's not the minimum royalty, regardless of amounts received, without respect to amounts received, but it was only with respect to the money received. What's sort of peculiar about your position is, I gather, that if they had gotten $5 from one of these customers, they would have owed $15,000 or $9,000. No. I'm not saying that, Your Honor. The — it's not a trigger. If a penny was received, we owe them $15,000. Rather, it was a pool of money. We were supposed to pay them up to that minimum royalty of the money we received. For instance, if we received — It doesn't say that. I mean, that you can't get out of this. It says — you can get out of it the notion that there has to be some net revenues, but I don't see how you get any notion that the minimum depends on what you receive. It doesn't say that. Well, the — with respect to net revenues language, Your Honor, it is our interpretation that what that means is, with respect to the money received, and that's how it's defined, because if you collapse the gross revenue and net revenue definitions, you get the — Well, with respect is awfully vague. It would mean on account of or because of, rather than out of. You're saying out of, and that doesn't parse to me. But if it does, it's at least debatable. With all due respect, Your Honor, I believe it is clear. The Court found it was clear. A plaintiff has never argued that it was not clear. And — Well, he certainly is arguing it's not clear, because he's arguing that with respect to the net revenues generated, et cetera, doesn't tell you anything about whether there has to be any net revenues. Your Honor, that is his argument. It is our position that, with respect to net revenues language, means that with respect to the monies received, I'm going to pay you $15,000 out of that money. Now, one of the things that I feel I should point out — So that would be the first $15,000 before the 60 percent goes into effect. Correct. Correct. Because net revenues is defined as gross revenues, and that is money received, less sales tax and refunds to customers. Correct. What we were guaranteeing them, Your Honor, is of the first dollars we received, you would get at least this minimum amount. With respect to that money we received, you would get the $15,000 per customer, and they were going to get those first dollars in. That's what this was designed to do. One of the — I hope whoever wrote this contract goes and writes a better one next time. Well, one of the things I would want to point out to the Court, because plaintiffs or select metrics spent a fair amount of time in its reply brief discussing this, is the parole or extrinsic evidence about what this — the history was between these parties in negotiating this agreement. It's our position that none of that's admissible. Under Yogevman, the Oregon Supreme Court case, the first inquiry the Court should make is determine whether the disputed provision is ambiguous within the context of the agreement. It's certainly ambiguous with respect to your second point, because I would read it the other way. And with respect to your first point, it's arguably ambiguous. Well, plaintiff has never argued — select metrics has never argued that it's ambiguous. The Court did not find it's ambiguous. But if the Court were to look at the extrinsic evidence, I would ask the Court to take a look. It tells a different story than the story that select metrics is telling. Select metrics would have this Court believe that they sought a new minimum royalty provision because they were — had a deteriorating financial position and they insisted that they were going to get money regardless of whether money was received. If the Court takes a look at the record in ER 108 through 111 and ER 112 through 116 — and I apologize, this is not in my brief because this came up in the reply brief — you will see the history of the negotiations of this provision. ER 108 is an e-mail from Peter Piazza, who was Net Ratings Counsel, to Mr. Kearney, Select Metrics Counsel. And attached to that is a markup of the agreement. And it's the second-round markup. And if you look at the language in the red line at Section 3.3, and most particularly at Exhibit A, you will see that what happened here was first Select Metrics put forward a minimum royalty provision that would be just the way they're arguing it is today. There was no discussion of net revenue. And it provided, quote, minimum royalty payments to owner under the hosted distribution agreement shall be the greater of $15 million per page, or $15,000 in the U.S. and $9,000 internationally. That's what they argued it was today. What happens, as you see in the markup, is Mr. Piazza says, no, we're not doing that. He argues that there should be a minimum pricing. If you then take a look at the next section I was quoting, ER 112, 113, and 114 through 116, you'll see what happens is Select Metrics pushes back and they say, we're not going with minimum pricing. And the language that Select Metrics inserts is the language from the original agreement that had been in place before this new agreement, before this supposedly deteriorating financial condition that required an absolute payment, and what we get is a minimum royalty payment with respect to net revenues, exactly what we have here today. So what happens if you look at the sequence of discussions between the parties, they put forward an absolute minimum royalty payment without any discussion of net revenue, without respect to it. That's rejected. They go to minimum pricing. That's rejected, and we end up with what we have here today, which is a minimum royalty provision only with respect to money received. If we thought there was an ambiguity in the contract, what would we do next? Well, I think if you think there's an ambiguity, I think you'd have to look at the record. I think the record I just pointed out makes it clear that the argument that they're propounding is not supported. That language is rejected. But I think the argument the Court is focused on, or the ambiguity the Court is concerned about, doesn't help the plaintiff. Because if it is, as Your Honor says, that there should have been a minimum royalty if they received $1.00, it didn't receive $1.00. No, I understand that. I mean, I understand that that that I'm saying it. I mean, I'm convinced there's an ambiguity on that issue. But if we thought there was an ambiguity, but that issue isn't really raised because there was no money. Correct, Your Honor. So then the question is, if we thought there was an ambiguity as to no money, as to whether if there was no revenue, how you would read this thing. And you say we then go to the extrinsic evidence, which was developed sufficiently for us to be able to make a summary judgment of termination. Yes, Your Honor. Okay. Thank you very much for your time. Thank you, Your Honor. We can give you one minute. Two points, Your Honor. One is the exchange between Mr. Shapiro and Select Metrics Council. It starts out, okay, please check with Aaron. I don't believe there was any notion of a guaranteed minimum ever discussed,  and what came back was a draft that eliminated any minimum. It was strictly a basis of revenues, and ultimately the parties went back to the guaranteed minimum, and I think that's very, very significant. As to the other point, you are exactly right. The argument that Net Ratings makes here is unsupportable by the language. Well, no, that's not what I said. I said one of the arguments they make, which isn't really relevant to this case. It is relevant, Your Honor, because net revenue. Notice that net revenue is gross revenue means all money amounts that have been received. It's a single number. It isn't gross revenue by contract. All money received is a gross revenue. Net revenue is gross revenue minus those certain subtractions. It's an aggregate number. It is not a contract-by-contract number. So they have to go to this pool of money by contract to make any sense out of it. If it were really, if there's net revenue, we get the amount that is stated. There was net revenue. That was the significance of the fact that there was no dispute that there was money paid on the VNU contract. Net revenue is simply not a contract-by-contract figure under this contract. It isn't customer-by-customer. Now, the minimums has to be calculated customer-by-customer, and the language that's in there about with respect to net revenue from within and without is to make sure that you don't do exactly what net ratings is now saying. You look at each contract and decide what's higher, the revenues from the contract or the minimum from the contract, because if you add up the higher of both of those, you get a much larger number than if you simply say, what is the total net revenue times 60 percent versus the sum of the customers and page view calculation? And that is why that language is in there. It does not say there's got to be a pool of money. It doesn't even say there has to be net revenues. It's simply trying to connect the two different computations, one of which is inherently a gross computation of the net revenue one, the other one which is inherently a contract-by-contract evaluation, because there's the 500-page minimum on a per-contract basis. Therefore, you can't simply add up all the page views. Just a minute. That can't be right, because even the phrase, when it says minimum royalty with respect to net revenues, it has to be the case that you go to a customer-by-customer basis at that point, so that, for example, if a particular customer has generated $20,000 in that year, you're not going to give them $15,000. It is not, Your Honor. You're quite correct. There was some sloppiness in this contract. If you look at this, this talks about net revenues. There is no net revenues defined in the contract. There's net revenue. The 3.3 talks about revenues without the net. There's some typos in there. There isn't $1.5 million total net revenue generated in a year. And you need to go and figure out, therefore, and let's suppose at the same time that we don't have the zero problem that we have in this case, that each customer has generated something, right? How are you going to figure out what the minimum is? You don't do it by customer. Notice the 3.1 talks about 1.5 million net revenue. It's a single number. But then it says the minimum royalty is $15,000 per customer. That's right. But it's not the whole idea, Your Honor, was this language, this introductory language was basically to eliminate that very confusion. You're not looking at the minimum by you're not giving 60 percent of the net revenue or the minimum by contract. You're adding up all the revenue and you're adding up all the minimum computations, and we get the higher of those two. If you did it contract by contract, under the normal circumstances, we would assume that we would get more because some contracts would be more profitable, more revenues compared to the page views than others. And the whole purpose of that introductory language was to make sure that the revenues from the profitable contracts could also cover the minimum on the unprofitable ones. But it also did not say that there had to be a minimum of net revenues. It simply said it's an attempt to say how the computation is done. Look at this total versus this total. Pay the higher of the two. That is exactly what this contract says, and it's the only way that you can read the contract so that we will receive the money that the contract says we will receive. Under their interpretation, we will receive if and only if something happens, and there is no language in that contract at all that has that if and only. The burden they're trying to stick on with respect to is just enormous. With respect to means concerning. The minimum revenue, the minimum royalty concerning revenues is one of two numbers. Okay. Thank you very much, counsel. Thank you. The case of Select Metrics versus Net Ratings is submitted, and we will go to the last case of the day, Hubbard versus Bimbo Bakery.
judges: Berzon, Bea, Gutierrez